IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 11-cv-1396-RBJ-KLM

FEDERAL TRADE COMMISSION, and
STATE OF COLORADO, *ex rel.*
JOHN W. SUTHERS, ATTORNEY GENERAL

    Plaintiffs,

v.

RUSSELL T. DALBEY;
DEI, LLLP;
DALBEY EDUCATION INSTITUTE, LLC;
IPME, LLLP; and
CATHERINE L. DALBEY

    Defendants.

## ORDER

    This case is before the Court on Russell and Catherine Dalbey's motion challenging the government's determination of their "maximum ability to pay" under an amended stipulated judgment entered by this Court on July 22, 2013. The motion has been fully briefed, and the Court heard argument on November 18, 2014. Following argument the parties were given time to negotiate an agreed resolution of this latest dispute. No settlement was reached, and the Court now grants in part and denies in part the Dalbeys' motion.

## BACKGROUND

    In about 1996 Russell Dalbey began pitching products and services that, he claimed, would teach people how to make money quickly by brokering promissory notes. Much of his advertising and selling was done via nationally broadcast infomercials. It was a scam. Mr.

Dalbey and his wife Catherine ultimately bilked approximately 900,000 gullible consumers out of hundreds of millions of dollars. According to the government, between 2006 and 2011 alone the Dalbeys received some $60 million through various corporate entities that they used to perpetrate the massive fraud.

The Federal Trade Commission and the Colorado Attorney General filed this lawsuit against the Dalbeys and their companies on May 26, 2011. The case was set for trial beginning May 28, 2013. During a pretrial conference on May 14, 2013 the parties disclosed that they had been discussing settlement. Approximately one week before trial the parties informed the Court that they had reached a settlement in principal and wished to vacate the trial date. *See* [ECF No. 277]. They later filed a stipulated order and, finally, on July 22, 2013, an Amended Stipulated Order for Final Judgment and Order for Permanent Injunction and Other Equitable Relief as to Russell T. Dalbey and Catherine L. Dalbey. [ECF No. 283]. A stipulated final judgment, executed by the parties and by a trustee for the Dalbeys' bankrupt companies, was entered on July 29, 2013. [ECF No. 285].

The parties' stipulation and judgment included the following terms:

- The Dalbeys were permanently enjoined from participating in any enterprise purporting to offer consumers a business opportunity and from engaging in telemarketing, the production of infomercials, and misrepresenting consumer products or services. [ECF No. 283 at 8-11].

- Judgment was entered in favor of the Federal Trade Commission and the State of Colorado against the Dalbeys in the amount of $330,084,354.70 as "equitable monetary relief" representing "consumer injury and disgorgement." *Id.* at 11-12.

- Payment of the judgment would be suspended pending certain disclosures by the Dalbeys, discovery conducted by the government, and ultimately the government's determination within 12 months of the Dalbeys' "maximum ability to pay amount." *Id.* at 12-14.

- Within 10 days of receiving the government's determination of their maximum ability to pay amount and its basis, the Dalbeys could either pay it or move the Court to reduce it. *Id.* at 12.

- If such a motion were filed, the Court must uphold the government's determination unless it finds it to be "objectively unreasonable" for the Dalbeys to pay the amount set by the government as their maximum ability to pay. *Id.* And "[i]n no circumstance shall the Court find such sum objectively unreasonable if inability has been self-induced by Defendants (*e.g.*, through asset protection vehicles or transfers to third parties not conducted at arms-length." *Id.* at 12-13.

- Suspension of the monetary judgment would be lifted if the Court finds that the Dalbeys "failed to disclose any material asset, materially misstated the value of any asset, or made any other material misstatement or omission in their financial statements or during asset discovery." *Id.* at 20. Upon the lifting of the suspension the full amount, $330,084,354.70, becomes immediately due. *Id.*

The government initially determined that the Dalbeys' maximum ability to pay amount was $1,715,808.61 but later modified that amount to $1,708,996.58. The Dalbeys moved for a reduction, claiming that their actual ability to pay was only $8,997. [ECF No. 293]. They supported the motion with documents purporting to show liabilities of $1,971,386 as of July 17,

2014 (including $1.5 million of "potential taxes owed" for 2006-2012) and assets of $8,997 cash in bank accounts. [ECF No. 292-1 at 7-10].

The government filed a response supported by 19 exhibits. [ECF No. 294]. The Dalbeys filed a reply, supported by the affidavit of their tax advisor. [ECF Nos. 295 & 296]. Both sides declined the Court's invitation to provide additional evidence at the November 18, 2014 hearing.

## FINDINGS AND CONCLUSIONS

The government claims that the Dalbeys have not acted in good faith. Rather, while living high on the hog, the Dalbeys have hidden assets and have been untruthful about their ability to pay. One wonders what the government expected from people who conducted a multi-year fraud that apparently extracted more than $300 million from some 900,000 individuals. In any event, the Court's task is to determine whether the government's determination of the Dalbeys' maximum ability to pay amount was "objectively unreasonable." The Court may not find the amount objectively unreasonable if the Dalbeys' inability to pay was self-induced.

The Court finds, after reviewing the "evidence" and arguments presented by the parties' lawyers that the following facts are more probably true than not true:

1. The Dalbeys lack credibility. They have never given any testimony in front of this Court – indeed, they have never set foot in the courtroom to the best of my knowledge. However, the massive fraud they perpetrated speaks for itself. The facts uncovered by the government (discussed below) are further evidence that the Dalbeys' representations are not credible.

2. The government's initial calculation of the amount the Dalbeys can afford to pay is itemized in a letter to the Dalbeys' counsel dated July 21, 2014. [ECF 292-1 at 2-5.] The calculation was based upon (a) sums in four bank accounts totaling $53,697.81 as of June 30,

2014; (b) $83,080.80 representing the value of silver bars owned by a Dalbey entity, the Successful Living Foundation; (c) $364,305.00 representing the acquisition cost of various items of personal property; (d) $648,886.00 held in a Gold Money account in the name of Russell Dalbey's mother, Marilena Dalbey; and (e) $565,839.00 "representing the total amount of federal income tax refunds due to Russell Dalbey for the years 2007, 2008 and 2009." These numbers add up to $1,715,808.61. The government demanded that $1,149,969.61 be paid within 10 days, and that Mr. Dalbey turn over the tax refund funds within three business days of receipt. *Id.*

3. The number was reduced to $1,708,996.58 when funds in the New Zealand bank accounts were converted to U.S. dollars.[1]

4. In April 2013 (the month before the parties informed the Court that they had been discussing settlement) the Dalbeys paid $325,000 to Aces Unlimited, a company owned by long-time friend John Wilson, ostensibly for litigation support services. Mr. Wilson is neither a lawyer nor a paralegal. In her deposition Catherine Dalbey could not identify what services Mr. Wilson provided. No credible explanation of the value of the services or the arms-length nature of the business relationship has been provided. The government does not include these funds in its determination of the amount the Dalbeys can afford to pay. The information is included as part of the overall picture of the Dalbeys and whether their claimed inability to pay was self-induced.[2]

---

[1] The government's math doesn't seem to add up. It suggests that the bank accounts (before currency conversion) totaled $52,067.03. Response at 2 n.1. However, the figures in the July 21, 2014 letter for the bank accounts add up to $53,697.81. The discrepancy is immaterial.

[2] The wording of the Amended Stipulated Order ("In no circumstance shall the Court find such sum objectively unreasonable if inability to pay has been self-induced by Defendants") does not state that the self-inducement must necessarily have occurred after July 22, 2013. Transactions that occurred during

5

5. Also in April 2013 the Dalbeys spent approximately $30,800 on a cruise.

6. July 2013 was a busy month. On July 9, 2013 Russell Dalbey's mother, Marilena Dalbey, gave the Dalbeys $265,000. By way of background, in 2005 Russell Dalbey "lent" $1.6 million to his mother to purchase a house in Seal Beach, California. The balance of the "loan" ($987,000) was forgiven in 2009.[3] Marilena Dalbey took out a $500,000 loan on the house and used $420,000 of the proceeds to open an account at Gold Money in Jersey, the Channel Islands. Those transactions obviously took place before the present lawsuit was filed. But the gift back from Marilena to the Dalbeys in July 2013, the same period of time that they were negotiating the final terms of a stipulation with the government and shortly after the Dalbeys had made the large transfer to Mr. Wilson, taken their cruise, and rented their home in New Zealand, is relevant. Defense counsel suggested that Marilena might not permit any further gifts or loans from this account, but no direct evidence was presented in support of this contention. Considering the totality of circumstances, including the origin of the funds and the "gift" at the same time the Dalbeys were depleting other assets, the Court finds that it is reasonable to infer, as the government does, that Russell Dalbey could probably obtain additional funds from Marilena Dalbey's Gold Money account if he needed them. At the time of the government's calculation of the Dalbeys' maximum ability to pay approximately **$648,886** remained in Marilena Dalbey's Gold Money account.[4]

---

the period of time when the parties were getting ready for either settlement or trial can reasonably be considered in determining whether the purported lack of assets was self-induced.

[3] The gifts to Marilena Dalbey were in addition to approximately $880,000 or more in salary that she had been paid between 2006 and 2009 for relatively little work. These monies are claimed by the bankruptcy estate of the Dalbey Education Institute to have been fraudulent transfers. *See* Response at 5; Tr. at 72-73.

[4] The government calculates this amount by taking the funds in Marilena Dalbey's Gold Money account before her gift of $265,000, purportedly $913,886, subtracting the $265,000, and assuming that no other withdrawals have occurred. *See* [ECF No. 292-1 at 4]. In that document (the July 21, 2014 letter explaining the government's determination of the Dalbeys' maximum affordable amount) the government

7. Also in July 2013 the Dalbeys paid $82,882 ($98,800 NZD) to rent a private home in New Zealand for a year.

8. On June 30, 2014 the Dalbeys had **$45,255** in various bank accounts. [ECF No. 292-1 at 9]. By July 22, 2014, when the court entered the Amended Stipulated Order for Final Judgment, the Dalbeys had drawn the accounts down to the $8,997 that they put forward as the maximum amount they can afford to pay.

9. The government ascribed $364,305 to the "acquisition cost" of the Dalbey's art, jewelry, URLs, bikes, and computer equipment listed in the Dalbeys' FTC Financial Disclosure Statement of July 23, 2013. [ECF No. 292-1 at 3]. In the same FTC Financial Disclosure Statement the Dalbeys represented that the current value of the items was **$81,443**. [ECF No. 294-2 at 33]. Neither side presents evidence of an appraisal of the items. While the Court is generally distrustful of the Dalbeys' representations regarding their financial position, theirs is the only current value figure in the record.

10. The Dalbeys informed the government that as of August 21, 2014 they lived at 3411 N. Valencia Lane, Phoenix, AZ 85018. According to the government this is a million-dollar, 4700 square foot property with a rental value of more than $4,000 a month. I was unable to confirm these figures through the web site listed by the government in its Response, [ECF No. 294 at 7, n.2], but the Court's own check of listings on the Internet did tend to confirm the figures. However, there is no evidence as to whether the Dalbeys are renting or own this property, and if they own it, the amount of their equity (or whether, as counsel suggested during the November 18, 2014 hearing, the Dalbeys were about to be evicted). The Court does not

---

references and apparently attaches several supporting documents. They were not attached to ECF 292-1, nor have I been able to find documentation of the $913,886 figure in the exhibits to the government's Response brief. However, the Dalbeys' counsel did not contest the amount, only whether Marilena Dalbey's assets can be considered to be available to the Dalbeys. Since both sides appear to recognize the validity of the amount, I accept it as accurate.

include any valuation of this asset in the maximum amount the Dalbeys can afford to pay and simply notes that it is an example of how the Dalbeys, despite their claims of poverty, continue to live well.

11. The government points out that, after obtaining professional asset protection advice in 2006, the Dalbeys created two trusts (one in 2006, the other in 2010) and retained a co-trustee in St. Lucia. By 2011 they had transferred some $6 million into their overseas trusts and apparently used much of the money to buy gold and silver bars through Gold Money, Inc. in the Channel Islands (the entity where Marilena Dalbey has her large account). They also purchased $1.5 million in gold and silver coins in the United States, which were then shipped to Hong Kong and Switzerland for storage. The Dalbeys claim that they have closed all of these trust accounts and repatriated the funds to the United States, although they continued to pay annual fees to the St. Lucia trust as late as November 2013. The Court has insufficient information to identify any available funds still in or repatriated from these off-shore accounts. The trusts are mentioned only as part of the environment in which the Dalbeys operate.

12. The Dalbeys own and control a 501(c)(3) organization, ostensibly created for charitable giving purposes, called the Successful Living Foundation. The government's letter of July 21, 2014 lists **$83,080.80** representing the sellback value of 40 silver bars owned by the Successful Living Foundation in its list of items comprising the amount the Dalbeys can afford to pay. The government suggested during the November 18, 2014 hearing that there might be as much as $130,000 in the Foundation, but it presented no corroborating evidence. *See* Transcript [ECF No. 300] at 54. The Dalbeys' counsel said only that there are liquid assets in the Foundation. *Id.* at 37. The Dalbeys claim that withdrawing funds from their Foundation would be unlawful, and that they would face a financial penalty for any withdrawals. Reply [ECF No.

295] at 6; Tr. at 35-36. No supporting analysis of the law was presented.[5] Interestingly, the Dalbeys propose that they turn over management and control of the Foundation to the government. No evidence was presented as to how that solves the illegality problem. The government heretofore has been unwilling to take on management and control of the Foundation, and given the Dalbeys' history, it is hard to criticize the government's position. The bottom line is that the Dalbeys always have an answer – we can't get more money from Marilena, we can't take money from the Foundation, our personal property isn't worth much, we don't have money in the bank, we are about to be foreclosed – at the same time they are making large transfers to others, taking luxurious trips, spending time abroad, and living in a beautiful and expensive home. In the vernacular, "it doesn't compute." In sum, the Court finds that the threat of an unproven and unquantified financial penalty is insufficient to eliminate the Foundation's assets as some evidence of the Dalbeys' ability to pay.

14. The government included in its calculation of what the Dalbeys could afford to pay $565,839 in future tax refunds. Russell Dalbey has filed amended tax returns for the years 2007 through 2009 seeking refunds in that amount. Response [ECF No. 294] at 12. Having noted the refund request, the government concedes that Mr. Dalbey is unlikely to receive a tax refund due to taxes he owes for 2006. *Id.* I assign no value to the refund claim at this time but find that, to the extent Mr. Dalbey does receive a refund for the years 2007 through 2009 that exceeds whatever taxes he incurs for 2006, the Dalbeys' maximum ability pay will be deemed to increase by 50% of the net refund. I divide the net refund in order not to disincentivise him from pursuing the refund.

---

[5] Government counsel argued that "it's sort of like cashing out a 401(k) or an IRA early, there are penalties and that's the cost of doing business." Tr. at 47. This, too, was unsupported by an analysis of the applicable law. The analysis presumably begins with 26 U.S.C. § 4941 concerning taxes on self-dealing.

9

15. The Court finds the Dalbeys' claim that they can only afford to pay $8,997 to be contrary to the evidence and all but absurd. Their lawyers are undoubtedly charging well in excess of that amount to continue to fight the government. Had the Dalbeys presented any reasonable figure and demonstrated any willingness to try to redress the financial consequences of their fraudulent acts they would have stood a much better chance of persuading the Court that they cannot afford to pay what the government believes they can afford. That $8,997 is not, in fact, the amount the maximum Dalbeys can afford to pay was also demonstrated by defense counsel's indication during the November 20, 2014 hearing that the Dalbeys would be willing to discuss settlement at some unspecified number above $8,997. The Dalbeys' suggestion at the end of their motion that they would be willing to surrender personal items worth (they say) $18,105 does nothing to change the impression that they will do what it takes to conceal and retain what they have.

16. The Court finds that, to the extent the government's determination of the Dalbeys' maximum ability to pay amount is reduced to **$858,665** (plus 50% of any net tax refund as discussed above) it is not objectively unreasonable. In arriving at that finding the Court considered the funds apparently in the Marilena Dalbey Gold Money account ($648,886); the funds in the Dalbeys' bank accounts at the end of June 2014 ($45,255); the Dalbeys' own estimates of the current value of their art, jewelry, URL's, bikes and computers ($81,443); and the amount that the government initially listed as assets in the Successful Living Foundation account ($83,080.80). This amount totals $858,664.80. The Court also considered the parties' evidence and argument concerning the enormous sums of money the Dalbeys amassed from the fraud; the Dalbeys' historical spending habits; the Dalbeys' efforts to protect their assets through off-shore trusts, gifts to relatives and friends, and otherwise; the government's findings as the

product of a year's worth of discovery efforts; the Dalbeys' preposterous representation of their inability to pay virtually anything; and the Dalbeys overall lack of credibility.

17. As the government has indicated, its focus on particular assets does not necessarily imply that those specific assets would be used to pay what the Dalbeys can afford to pay. There is no evidence, for example, that Russell Dalbey has a legal right to withdraw funds from Marilena Dalbey's Gold Money account. The account is not his "asset." Nor does the Court have the authority to order a non-party, such as Marilena Dalbey, to pay anything to the government.

18. Government counsel indicated that consumers contact her office frequently asking whether they will get their money back. Unfortunately, $858,665, or even the $1.7 million the government believed was reasonable, would provide no remuneration to the victims of the Dalbeys' fraud. It is simply too small a sum to parcel out to some 900,000 victims as a practical matter. Thus, while a $330 million judgment looks impressive, the monetary piece is essentially a Pyrrhic victory. Hopefully the injunctive relief will prevent the Dalbeys from defrauding anyone else.

## ORDER

The government's determination that the Dalbeys' maximum ability to pay on the stipulated judgment is $1,708,808.61 is objectively unreasonable. However, if the amount is limited to $858,665 (plus 50% of any net tax refund for the combined years 2006 through 2009) it is not objectively unreasonable. Accordingly, the Court grants the Dalbeys' amended motion for review [ECF No. 293] with respect to the government's determination to the extent that the determination exceeded that amount but otherwise denies the motion.

DATED this 29th day of December, 2014.

BY THE COURT:

_____

R. Brooke Jackson
United States District Judge